# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-17-00657-CR

---

**Damon Fowler, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 147TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-16-301600,
### THE HONORABLE BRAD URRUTIA, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Damon Fowler of the offense of murder and assessed his punishment at 55 years' imprisonment. The district court rendered judgment on the verdict. In three points of error on appeal, Fowler asserts that: (1) the court's charge failed to provide a complete instruction on the accomplice-witness rule; (2) the evidence is insufficient to corroborate the testimony of the accomplice witness; and (3) the district court erred in failing to allow Fowler to waive his right to a jury trial. We will affirm the district court's judgment.

### BACKGROUND

The State charged Fowler with the murder of Kennie Crockett. On August 20, 2016, Crockett was a passenger in a Nissan Infiniti owned by his friend, Robert Otems. Otems was driving Crockett around East Austin, attempting to locate a Toyota Camry that Crockett co-owned

with Lyzentia White, a maternal figure to Crockett.[1]  The Camry was then in White's possession, and she was using the Camry to drive around town Fowler, a man with whom she had a romantic relationship.  This had upset Crockett, who wanted to use the car.

While Otems and Crockett were driving northbound on Decker Lane, they encountered White and Fowler in the Camry, which was headed southbound.  After an unsuccessful attempt to stop the Camry by pulling in front of it and into the southbound lane of traffic, Otems turned his Infiniti around and proceeded to follow the Camry.  At one point, both cars were side by side at a stop sign and, according to Otems, "words were exchanged" between Fowler and Crockett.  Both cars eventually stopped in the parking lot of an apartment complex where Fowler's brother, Donald Perkins, lived.  Fowler then got out of the Camry and approached the Infiniti.  Shortly thereafter, someone fired a gun into the Infiniti and the bullet hit Crockett, who ultimately died from his wounds.

Perkins testified that he was standing outside his apartment when the shooting occurred.  He recounted that he saw Fowler approach the Infiniti holding a gun, attempt to open the driver's side door, and point the gun at the car.  Perkins then turned around to return to his apartment and heard a gunshot.  When Perkins turned back toward the parking lot, he observed the Infiniti drive away while Fowler got back into the Camry, which also drove away from the apartment complex.  Each driver, Otems and White, also testified at trial and described the circumstances that preceded and followed the shooting.

---

[1]  White and Crockett were not related, but White testified that she was friends with Crockett's family, that Crockett was several years younger than her, and that he referred to her as "aunty" or "mom."

Based on the above and other evidence, which we discuss in more detail below, the jury found Fowler guilty of murder and assessed punishment at 55 years' imprisonment as noted above. This appeal followed.

## ANALYSIS

**Corroboration of accomplice-witness testimony**

The State initially believed that Perkins had been involved in the shooting and thus charged him with Crockett's murder. However, after Perkins agreed to testify for the State, the State dismissed the charge against him. The State does not dispute that under these circumstances, Perkins was an accomplice witness. *See Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017); *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). In his second point of error, which we address first, Fowler asserts that the evidence is insufficient to corroborate Perkins's testimony.

"The Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice; 'accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person.'" *Smith*, 332 S.W.3d at 439 (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)). Therefore, "Texas law requires that, before a conviction may rest upon an accomplice witness's testimony, that testimony must be corroborated by independent evidence tending to connect the accused with the crime." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (citing Tex. Code Crim. Proc. art. 38.14). This is known as the accomplice-witness rule. *See Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused

3

with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). "To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id*. (citing *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *Gill*, 873 S.W.2d at 48). "Rather, the evidence must simply link the accused in some way to the commission of the crime and show that 'rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Id*. (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)).

"The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case." *Smith*, 332 S.W.3d at 442 (citing *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988)). The evidence may be direct or circumstantial. *Id*. "Motive and opportunity evidence is insufficient on its own to corroborate accomplice-witness testimony, but both may be considered in connection with other evidence that tends to connect the accused to the crime." *Id*. "Similarly, 'proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.'" *Id*. at 442–43 (quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993)). Evidence of the defendant's behavior and demeanor both before and after the commission of the crime, as well as any pre-existing relationship with the victim, should also be considered. *See id*. at 445–47. Moreover, the corroborating evidence need only "connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007).

We are to view the corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing *Gill*, 873 S.W.2d at

4

48). "So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Smith*, 332 S.W.3d at 442. Finally, we are not to take a "divide and conquer approach" to the evidence but must consider "the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Id.*

In this case, the evidence that "tends to connect" Fowler to the offense includes a 911 call that Crockett made as he and Otems were following the Camry. On the call, Crockett can be heard explaining to the dispatcher that "this dude" in the Camry had "hit me two nights ago in my face" and that this person was now in the Camry "screaming" at Crockett and threatening to "whoop [his] ass." It is undisputed that there were only two people, White and Fowler, inside the Camry at the time, so the jury could have reasonably inferred that Crockett was referring to Fowler. Crockett also told the dispatcher, "I want the police here. Because if he assaults me again, I'm pressing charges." After the cars parked at the apartment complex, Crockett informed dispatch, "Ma'am, he's coming, he's approaching my friend's vehicle like he wants to fight." Crockett then can be heard telling someone, "Hey, homie, don't do nothing yet. We got the cops on the way." Immediately thereafter, Crockett can be heard on the call yelling, "I got shot! I got shot!"

Otems also provided evidence that tended to connect Fowler to the offense. Otems testified that when the cars parked in the apartment complex, the passenger in the Camry, whom Otems later identified in a photo lineup as Fowler, "jump[ed] out of the car" and approached the driver's side of Otems's vehicle "to try to pull [the] door open." Otems recounted that his door was locked, so Fowler "started pulling the handle harder" and, "after he noticed the door was locked, he stepped back." Otems did not see Fowler with a gun during the incident, but he did characterize Fowler's behavior as "aggressive." He explained, "Once I seen that he was that aggressive, I just

5

drove off trying to get away from the scene." As he was driving away, Otems heard Crockett telling 911 that he had been shot and noticed that Crockett had sustained a bullet wound to his shoulder.

White, who had married Fowler prior to trial, also provided some testimony that tended to connect Fowler to the offense. Although White claimed that she did not see Fowler with a gun either before or after the shooting, she acknowledged that Fowler had exited the Camry immediately after they parked at the apartment complex, that Fowler "went somewhere towards" Otems's car, and that she heard a gunshot shortly thereafter. White also testified that she had seen Fowler assault Crockett two days prior to the shooting.

Additionally, in a statement to the police following his arrest, Fowler denied shooting Crockett but acknowledged that he had been in an altercation with Crockett two days before the shooting. Fowler also admitted that he was at the apartment complex when the shooting occurred and that before the shooting, he had exited his car, approached the driver's side of Otems's car, and had tried to open the door.

Because of Fowler's proximity to the driver's side of the Infiniti when the shooting occurred, there was also forensic evidence that tended to connect Fowler to the offense. Shannon Shafer, a crime scene specialist for the Travis County Sheriff's Office, testified that the bullet entered the vehicle from the driver's side rear window, went through the driver's seat headrest, and entered the front-seat passenger area of the vehicle, where Crockett had been sitting. Dr. Satish Chundru, the medical examiner who performed an autopsy on Crockett, testified that the cause of Crockett's death was a gunshot wound to his left shoulder. Chundru explained that the bullet had entered Crockett's left shoulder, went into his chest, and punctured his lungs and his heart, where it struck his aorta and pulmonary artery and caused massive internal bleeding.

6

In summary, the State presented evidence from multiple sources that "tended to connect" Fowler to the offense. The forensic evidence established that someone had fired a bullet into the Infiniti from outside the driver's side of the vehicle, which entered Crockett's left shoulder and caused his death. Otems provided testimony from which the jury could have reasonably inferred that the shooter was Fowler because Otems identified Fowler in a photo lineup as the man who had exited the Camry, approached the driver's side of the vehicle, and attempted to open the driver's side door in an "aggressive" manner. Other corroborating evidence included Fowler's statement to the police admitting that he was on the driver's side of the vehicle and tried to open the door before the shooting and White's testimony that Fowler had exited the Camry and "went somewhere towards" the Infiniti, after which she heard a gunshot. Moreover, in Crockett's call to 911, he can be heard telling the dispatcher that a "dude" in the Camry had previously assaulted him, that this person was threatening to assault him again, and that this same person was "approaching [Otems]'s vehicle like he wants to fight." Seconds later, Crockett can be heard telling someone, "Hey homie, don't do nothing yet. We got the cops on the way," and then exclaiming, "I got shot! I got shot!" Based on the other evidence summarized above, including White's testimony that Fowler had assaulted Crockett two days prior to the shooting, the jury could have reasonably inferred that the person to whom Crockett was referring on the call was Fowler and that Fowler was the person who had shot Crockett. We conclude that the "combined force" of the above evidence, when considered in the light most favorable to the jury's verdict, sufficiently corroborates Perkins's testimony. *See Smith*, 332 S.W.3d at 442–47 (explaining that sufficient corroborating evidence tending to connect defendant to murders included "motive and opportunity" evidence, defendant's presence at crime scene, pre-existing relationship with victims, behavior before and after murders were committed, and statements by defendant made to police officers); *Simmons v. State*, 282

7

S.W.3d 504, 511 (Tex. Crim. App. 2009) (explaining that corroborating evidence should be "viewed together, rather than as isolated, unrelated incidents" when assessing its sufficiency); *see also Maxwell v. State*, No. 03-09-00027-CR, 2010 Tex. App. LEXIS 9036 (Tex. App.—Austin Nov. 12, 2010, pet. ref'd) (mem. op., not designated for publication) (discussing corroborating evidence in murder case in which victim was allegedly shot in vehicle by defendant).

We overrule Fowler's second point of error.

**Charge error**

We next address Fowler's first point of error, in which he asserts that he was egregiously harmed by the district court's incomplete charge on the accomplice-witness rule. The charge instructed the jury that it could not convict Fowler "unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged." However, the charge failed to provide a definition of an accomplice, failed to identify Perkins as an accomplice, and failed to contain an application paragraph instructing the jury on how to apply the accomplice-witness rule to Perkins's testimony. The State does not dispute that the charge was erroneous for these reasons, and we agree that it was. *See Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013) (describing requirements of proper accomplice-witness instruction); *Vasquez v. State*, 389 S.W.3d 361, 366–67 (Tex. Crim. App. 2012) (explaining that application paragraph is "the heart and soul" of jury charge because it "specifies the factual circumstances under which the jury should convict or acquit" by applying "the pertinent penal law, abstract definitions, and general legal principles to the particular facts" of each case). Thus, the only disputed issue is the degree to which Fowler was harmed, if at all, by the erroneous charge.

When there is jury-charge error, we apply the familiar *Almanza* framework for assessing harm. *See Almanza v. State*, 686 S.W.2d 157, 171–72 (Tex. Crim. App. 1985) (op. on reh'g). "Under *Almanza*, the degree of harm required for reversal depends on whether the error was preserved in the trial court." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Almanza*, 686 S.W.2d at 171). Here, Fowler did not object to the charge at trial. Thus, "reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Id*. "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id*.

"Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id*. (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "In examining the record to determine whether charge error has resulted in egregious harm to a defendant, we consider (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole." *Id*. "Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). "In assessing the strength of the non-accomplice evidence, we examine (1) its reliability or believability, and (2) the strength of its tendency to connect the defendant to the crime." *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016).

9

As discussed above, the corroborating evidence included forensic evidence establishing that the fatal bullet had entered the Infiniti from outside the driver's side of the vehicle; eyewitness testimony and the appellant's own statement tending to show that Fowler was outside the driver's side of the vehicle when the shooting occurred, trying "aggressively" to open the driver's side door; and a 911 call in which Crockett can be heard explaining to the dispatcher that the man in the Camry—who was, by all accounts, Fowler—had assaulted Crockett two days prior to the shooting, had threatened to assault him again, and was "approaching [Otems]'s vehicle like he want[ed] to fight." We cannot say that this evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *See Ambrose*, 487 S.W.3d at 599; *Casanova v. State*, 383 S.W.3d 530, 539–40 (Tex. Crim. App. 2012).

Moreover, this was not a case in which an accomplice-witness instruction was omitted entirely from the charge. The jury had been instructed that it could not convict Fowler "unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged." Although the charge itself did not identify Perkins as the accomplice in the case, the State, in its closing argument, identified Perkins as a possible accomplice and explained to the jury that if it "believe[d] that Donald Perkins had any involvement in this murder, that means that he and his brother Damon would be accomplices." The State then went on to explain the accomplice-witness rule to the jury as follows:

> And what this rule basically says is, that you can't rely on the accomplice's testimony alone. There has to be corroborating evidence, and that evidence has to actually connect the defendant to the offense itself. Okay? So if two people, you know, committed a crime, you can't just bring one of them in and say, yeah, that guy did it and be done with it. You've got to have evidence that supports it, because obviously there's a motive there. There's definitely a reason to be biased there if you're charged along with somebody else. So all the accomplice witness rule says

10

is, you can't rely on that person's testimony alone, but you have to have other evidence that supports it; and we do here.

Number one, I don't think the evidence shows at all that Donald Perkins was involved in this offense, but if you do so believe, we do have all of this corroborating evidence that I've just explained to you and the physical evidence and the testimony that corroborates what Donald Perkins said.

Later, the State added, "Bottom line, you have plenty before you.  I'm not asking you just to rely on Donald. . . .  We have corroboration of everything that he said."  Thus, the State explained the accomplice-witness rule to the jury, identified the witness to whom the rule applied, and drew the jury's attention to the corroborating evidence, which, as discussed above, tended strongly to connect Fowler to the offense.  On this record, we cannot conclude that Fowler was "egregiously harmed" by the incomplete accomplice-witness instruction in the charge.

We overrule Fowler's first point of error.

**Jury-trial waiver**

Prior to jury selection, a hearing was held to discuss the clothing that Fowler would wear during trial.  Fowler did not want to wear the clothing that defense counsel had provided to him.  However, counsel informed the trial court that he had advised Fowler to wear the clothing that counsel had provided so that the jury might have a more favorable impression of him.  After the court suggested to Fowler that he follow counsel's advice, Fowler remarked, "Actually, you know what, I really don't even want no trial by jury.  I would rather a trial by judge."  Counsel then advised Fowler against a bench trial, the discussion returned to the subject of clothing, and the case proceeded to a jury trial without further request from Fowler to have a bench trial.  In his third point of error, Fowler asserts that the district court erred in not following the proper procedure for allowing Fowler to waive his right to a jury trial.

11

Although a defendant has a constitutional right to a jury trial, *see* U.S. Const. amend. VI; Tex. Const. art. I, § 15, a defendant has no constitutional right to a bench trial, *see Singer v. United States*, 380 U.S. 24, 34–36 (1965). Instead, a defendant has a statutory right to waive a jury trial, but only if certain procedural requirements are satisfied. Those requirements are found in Article 1.13 of the Code of Criminal Procedure:

> The defendant in a criminal prosecution for any offense other than a capital felony . . . shall have the right, upon entering a plea, to waive the right of trial by jury, conditioned, however, that . . . the waiver must be made in person by the defendant in writing in open court with the consent and approval of the court, and the attorney representing the state. The consent and approval by the court shall be entered of record on the minutes of the court, and the consent and approval of the attorney representing the state shall be in writing, signed by that attorney, and filed in the papers of the cause before the defendant enters the defendant's plea.

Tex. Code Crim. Proc. art. 1.13(a).

As an initial matter, we observe that trial counsel opposed Fowler's attempt to waive his right to a jury trial. Because a defendant has no right to hybrid representation, "a trial court is free to disregard any pro se motions presented by a defendant who is represented by counsel." *Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007). Thus, to the extent that Fowler's remark could be construed as a pro se motion to waive his right to a jury trial, the district court did not abuse its discretion in disregarding the remark. We further observe that Fowler did not object to the district court's decision to proceed to a jury trial without inquiring further into Fowler's earlier remark. Thus, to the extent any such inquiry was required, Fowler failed to preserve error, if any, in the district court's procedure. *See* Tex. R. App. P. 33.1(a). Finally, none of the requirements for a jury waiver were satisfied here. Fowler did not make his request "upon entering his plea," the waiver was not made "in writing," and the waiver was not made "with the consent and approval of

12

the court and the attorney representing the state." *See* Tex. Code Crim. Proc. art. 1.13(a). Accordingly, on this record, we cannot conclude that the district court abused its discretion in proceeding to a jury trial. *See Singer*, 380 U.S. at 36; *State v. McDonald*, 676 S.W.2d 371, 373–74 (Tex. Crim. App. 1984); *see also Hejny v. State*, Nos. 05-06-00159-CR & 05-06-00160-CR, 2006 Tex. App. LEXIS 8186, at *15–19 (Tex. App.—Dallas Sept. 18, 2006, no pet.) (op.) (similarly concluding that trial court did not abuse its discretion in denying defendant's attempt to waive his right to jury trial).

We overrule Fowler's third point of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed: June 26, 2019

Do Not Publish

13